for today is 2017-50465, United States of America v. George Lamar Darryl Foster. You may proceed with your argument. Ruben Morales on behalf of George Foster. Confrontation is a bedrock principle of our system of trial by jury. It's whenever I take a client up to plead guilty, it's one of the key things that I tell him that he's waiving. You're giving up your right to confront the witnesses, to have them come testify against you in trial, to see them in person before you. And that's the issue, the primary issue that I'm going to focus on in this case. And then if I have some time, I'd also like to talk about the extraneous offenses that were the key witnesses for the government. One was a special agent. His primary goal in this case was to provide a statement that Mr. Foster had given to him where he inculpated himself and admitted to committing the offense. And then the other two witnesses were witnesses that appeared by video deposition. They were aliens that were in the truck that Mr. Foster was driving, and they're the people that he was charged with transporting illegally in this case. I'd like to focus most of all on the issue of unavailability and whether or not the government met its burden in showing that these witnesses were unavailable. And of course, it's our contention that they did not do that. In this case, prior to trial starting, they had filed a motion to have the witnesses declared unavailable and to have them be allowed to testify by video deposition. On July 22nd, when they were released from custody after they had given their depositions, were they just released and told to voluntarily return? The record's unclear to me on what happened. It is unclear, and that's one of the issues that I had was that I believe that since it's the government's burden to prove unavailability, it was the government's burden to clear up the issue as to how that occurred and what instructions they were given and what they were told. All we know with respect to how the release happened was what was contained in one of the pleadings filed by the government, where they indicated that one of the individuals had been given a letter with instructions, and it's very vague as to what those instructions were. There was no copy of that letter ever provided to the district court. And then there's, I guess, statements made that they were released on that date, but that's the extent of what we know as to what occurred. I thought the record confirmed that they had been put under oath when they gave their contact information, and under oath they said they would update it. No, that is absolutely true. During the video deposition, obviously they were under oath during the video deposition. What more can the government do than having someone under oath say, we will tell you where you can always find us? I think that's very simple. I mean, they can verify information. They can call the numbers. They can ask for additional numbers, additional points of contact. I mean, these are things that I do every day when I, let's say when I'm meeting with a new client, comes into my office, okay, can I have your phone number? Can I have collateral contact information? Where do you work? Your mom's phone number. Do you have a brother in town or something? Right. Yeah, I mean, that's a very good point. I mean, they may have someone that lives in the United States. But back on my point, the witnesses have said under oath they will give you updated information. Why would you have any doubt once someone's under oath that they'll do that? I don't see why you'd have to keep verifying what they sworn to do. I apologize. The reason I believe you would have some doubt is because of the situation that these individuals found themselves in. One, they were in the country illegally, so they were charged with a crime, and they were being offered this opportunity to testify at the deposition so that they would no longer be prosecuted for this particular crime. And so, it stands to reason that once these people left, they would not have a desire to come back to the United States to possibly, for all they know, they don't know how our system could have additional charges placed on them. Right. But that is speculation, because it would be just as valid speculation to think they would continue to want to come in the United States. They would love any opportunity to return that was legal. All that might be true. The incentive structure is hard to guess at. And so, that's another thing that I think that the government could also do to avoid these witnesses being unavailable, is to offer them the opportunity to stay in the country. And that's mentioned in several of the other cases. And several of the other cases, I think Ali, to be specific, in that case, they talk about the fact that, you know, these individuals were offered the opportunity to stay within the country. So, once you're doing things like that, it's hard to fault the government and say, look. But no court has set up a rule that says good faith exists only if you hold them or parole them or put them in a halfway house. That would be a very hard rule to apply here, that the government has to keep them for some future trial date. They may want to go home to their families. And that's absolutely true. There is the language in those cases, in various cases, that say there's no per se rule that the government must keep them in the United States and not deport them. So, what would be the most exact description of the rule you propose? Well, and the rule that I propose is what's mentioned in Tirado, which is one of the most well-known, Tirado, Tirado, both last names, in which they indicate while their government is not per se required to do this, the best practice would be to offer them the opportunity to stay in the country, whether it's through a work permit or some other means where they could stay in the country. Could they hold them in some sort of detention? Yes. They could be a material witness warrant or something. Can they hold them if they wanted to? I'm not as experienced in this, perhaps, as my colleague, who... Actually, the way it works in El Paso, which is where we were, is they, initially they're arrested and they're taken to the magistrate, and then they're released to a halfway house. It's called Dismiss Charities. It's, you know, they're allowed to live there. It's not a lockdown facility. They're there voluntarily. And that's where these particular individuals were from the date they were arrested to July 22nd. So, that is an option. So, they could have stayed there. It's not clear to me, how do we know that they actually voluntarily returned to Mexico? I mean, is that clear in the record? How do we know? That they actually did leave? Because it didn't seem that they were... There was not... Is it possible... I mean, do we know that they left? No, I would agree with you. We don't actually know what happened. I mean, there was, like the pleadings filed by the government that these two individuals had been deported, and they were no longer available. Were they deported? Were they actually escorted with government officials to leave the country? Again... Or were they told to voluntarily depart, and people lost track of them? That's not clear in the record. That's not made clear anywhere in the record. And again, going back to my original statement, the burden is on the government to prove this. And the issue of whether or not they were actually unavailable, as to how this occurred. Do you agree, though, that the actions in November and December were certainly sufficient at that time? You don't have any quibbles with those actions? I actually do, because those actions in November and December, if you really break them down, I know it's written in three pages in the government's brief, and it seems to be quite a bit of effort. But essentially... We'll have a timeline. Go ahead. I'm sorry. When you break down what they indicated their efforts were, basically, they made several phone calls to one of the witnesses who had given them a phone number. And to the other witness, they sent them various emails. So I think there's an indication that... Let's see, on November 8th, they sent both of them... One got a phone call, the other one got an email. On the 22nd, they both got... Well, one didn't get an email, one didn't get anything. On December 7th, again, a phone call and an email. On the 14th, a phone call. What else could they have done at that time? And they contacted the lawyers for them in the prior... Well, they contacted the lawyer in... According to the document, the pleading filed by the government, they contacted the lawyer in December, asking him to send a letter to the government. And so... And then they asked the Mexican government to assist? It's not really clear what they did. I mean, there's a... Homeland Security did, didn't they? There's a representation that there was a collateral request to the HSI attache in Mexico. That's what the pleading says, something along those lines. And that there was no response. So we don't know if no response means we never got a hold of them, they never talked to us, or if no response means we talked to them, they went out and looked and made an effort. Which, if they had done something like that, then I think we're getting to the point of maybe where you're thinking maybe they've made reasonable efforts. So without the officials in Mexico cooperating and going and looking, or else people sending agents, U.S. agents, into Mexico to go to the town they lived in and all of that sort of thing, you think it's insufficient, even in November or December? Is that what you're saying? What I'm saying is that we don't know what happened. So we have these general statements that there was contact made with certain persons. And we don't know what that contact was, what that contact involved. Do you have any case that would say that you have to go door to door? No, there's absolutely no case that says you have to go door to door. But what the cases do say is you have to make reasonable efforts. And reasonable efforts are more than just making phone calls. So the cases that hold in favor of the government and say, you're the right to stay, they didn't want to stay, they left, you can't make them stay. You gave them a letter with very specific instructions as to what they needed to do to come back to court and you told them here's the directions to your nearest embassy back in Mexico. Here's the contact information for the agent, here's the contact agent for the prosecutor, or whatever that may be. They're taking steps to make sure that these people have the ability to get back if they so desire to come back and be a witness. The other thing that I think is key, and I know you asked me about this a little bit earlier, you said well what about the efforts they took in November and December, do you agree that those were sufficient? Whether they were sufficient or not sufficient, one of the key issues, and again this is mentioned in Tirado, is the time frame as to when the witnesses. In Tirado, there were two issues. One, they waited too late. The two issues that the court had with what the government did was that they waited too late to start making the efforts, and so arguably in this case, we're a couple of months before trial, so it's not the same as Tirado where they waited a week. But the other thing that they indicated was that the government made no effort to stay in contact with the witnesses, and that was key. So you're saying between July and November, something should have been done? There should have been an attempt to continue. Monthly calls, hey we're still out here, we don't have a date yet, is that what you're saying? That could be one thing. There's no hard and fast rule as to what they should do, but yes, there should have been continued contact, whether it's phone calls, whether it's letters, whether it's come back to the border and meet us, and then we'll have an idea at that point whether we can contact you. I know Judge Higginson, you had indicated that isn't it enough to get their information under oath? Given the importance of the issue we're dealing with here, confrontation, given how frowned upon it is to try someone by deposition, and that's stated in all the cases too, we don't want to do that, we don't want to try people by deposition. Minimal efforts of verifying an address, of getting collateral contacts, of verifying phone numbers, that's not too much to ask. And they talk about that in one of the cases, let me see if I can, it was one of the cases that's cited in both briefs also, one of the main cases that talks about the fact that this is a very important issue, and to require these minimal efforts is not too much to ask, given the issue that's being dealt with. So what was the exact date of the depositions? The exact date of the depositions was July 22nd, I believe. Of what year? Of 2016. And the trial was initially scheduled for January of 2017, and then eventually it happened in February of 2017. Okay, and you agree though that they did reach out the day after they got the notice of the date for the trial? They were, November 7th they knew that they had a trial date, and November 8th they began in earnest to... So if I could, one thing that I had an issue with when we were litigating the issue, was I wanted the some kind of testimony or evidence to support their request that these witnesses be declared unavailable, so that we could ask questions and get more information and get more detail as to some of the things that your honors are asking. So these are represented in briefs, but they've never been verified under oath? Right, they've never been verified under oath. And just take for instance the letter, the letter that was talked about. There's these letters that were sent. Well, what did those letters say? Were those letters in Spanish? Were they in English? Were they both in Spanish and English? Did these people speak English? And you requested a hearing under oath, and you were denied to put people on the stand and cross-examine them about their efforts? So we were discussing the matter with the court at a hearing, I think it was a pretrial hearing, I can't for the life of me at this point remember, but we were having a hearing, and I asked, I mentioned to the trial court that they needed to put on evidence to support this, and the judge, essentially what his response was, well, you know, I've dealt with many of these cases, and I know the efforts that the government goes through, and we don't need to do that. So did you make a record that you wanted to put on a hearing and object? Go ahead. Sorry, my mistake. I believe that there was a point on the record where I indicated that I wanted the government to have to, I guess. But after the court ruled, did you say, I object to that ruling, and it implicates confrontation rights, a core essential right, and you're depriving me of that opportunity. I can find that on the record somewhere that you made a big, long objection. It doesn't have to be long. No, where I'm objecting to confrontation, I'm saying, judge, I want you to do this. I want you to make them carry their burden of proving that these witnesses are unavailable. And then at another point, when the actual depositions are being admitted, I'm making and remaking my objections to confrontation. You make those then, but you also make them before, to require some sort of evidentiary hearing, and you're deprived of that opportunity. I did ask the court for an evidentiary hearing where the government would be required to prove this up, and that was the case. He'd seen these kinds of cases before, and he knows exactly what they do, and he's familiar with the efforts that they make, and so therefore, that was not necessary in this particular case. Okay. Similarly, on the 30-minute deposition, the cross-examination, what were you unfairly excluded from showing because of the 30-minute limit, and did you make a record of that? So that one, no, there was no record of that. I would agree with you that there's no record showing what portions I would have liked to bring in. Do you object? Go ahead. And my time is up. May I continue? Please answer, yes. What I did do is I indicated that I wanted the full deposition to be admitted, and that is on the record, but then once I was denied that opportunity, I would agree with Your Honor that I did not go and specify more detailed portions. But can we give you relief then? If you can't tell us how you were harmed, could we give you relief on that basis? I think you can give me relief on the basis of primarily the unavailability basis. I think that's the key issue. The unavailability, not on the 30-minute limit. The 30-minute limit, I think, and this is the way I believe it comes into play, is the fact that the 30-minute limit is showing why this was harmful, because of the fact that you have these witnesses who are testifying two weeks after the case has started, basically, way before the theory of the case has been developed by the defense. And just so Your Honor is familiar, at the time of the deposition, I was not the attorney that actually did the deposition. That was a different attorney, because there was a change of theory of the case, with a different attorney, with a different theory of the case. But I understand what the Court's saying. I mean, there's no record as to specifically what I would have brought, if I hadn't been limited. Either what you would have shown in the deposition testimony that you were not allowed to show, and what other additional questions you would have liked to ask these witnesses. There's no record of either of those things. Is that correct? There is no record of either of those things. Thank you for your candor. Can I say one last thing? Last thing, and then we've got to... And I understand. Even though I'm saying, I think the harm with respect to that issue of the limitation is different than the harm with respect to the unavailability. That's all I want to say. Thank you. Thank you. Good morning. May it please the Court. Good morning. My name is Angela Braba, and I represent the United States. I'd like to begin, first of all, just as a point of clarification before moving into the unavailability issue, is there was some... The Court had some concern about whether or not the appellant had requested a hearing for actual witnesses to testify about the efforts that the government made. And there was no request for a hearing. The defendant's attorney commented to the Court, expressed concern that the government had not put on... It wasn't part of the record, or the record didn't reflect what efforts were made. And at that point, the Court said, well, the record is made when they file their motion. And rather than... And the important thing to note about that is, these are representations by a government representative, being the prosecution, about what efforts the government made. This is not a confrontation issue about witnesses testifying against the defendant in factual context. But it is a factual situation. I mean, it would be completely reasonable to make you produce documentary evidence and to put your paralegal or whoever was responsible on the stand to say, I called so-and-so and I... That's just because you're the government doesn't mean you... I mean, we hope that and we expect you to have your duties, but it doesn't mean that you automatically are credible. No, and I understand that, Your Honor, but the Court does have discretion to manage the way he manages his cases. But in this case, the Court accepted those facts as true. There was no dispute in the trial court about what efforts the government made. And the defendant's attorney even said he had no... I think maybe the language was something about he didn't have a doubt whether those things were done or something to that effect. So the Court then basically could accept those representations as fact. There was no dispute about what the government made. So in that respect, and I'll move away from that. Now, I'd like to address the unavailability argument. And to determine whether the material witnesses were unavailable for trial, the law only requires that the government make a good faith and reasonable effort to obtain the presence of the witnesses. In this case, the government's to assure the presence of the witnesses began at the very deposition. And during that deposition, the prosecution talked to each of the witnesses and made sure are you willing to return in the event of a trial? The witnesses assured them, yes, they would return. They made sure that the witnesses under oath gave contact information to the agent who was representing those material witnesses. So these are witnesses who are under oath giving their contact information. Now, the defendant made a point or the appellant made a point that they should have done something to make that information valid or to make sure that information was valid. But the ability of the government of the United States to conduct an investigation in a foreign country is extremely limited. But before you released them, you could have gone and double checked to see if those were even legitimate addresses or whatever, couldn't you have? If their addresses are in Mexico, Your Honor, I think it would be difficult to determine whether or not they're valid. We do determine whether the government does that sort of thing in other types of proceedings. They determine things in foreign countries. Well, and that is true, Your Honor. I'm not saying that it's impossible, but I'm saying on a day-to-day basis to require the every time a person gives an address and a phone number is unduly burdensome. Especially if they're, and in this case, Your Honor, there is no evidence that that information was invalid. Is there any evidence in this record that they even went back to Mexico and went to that address? Did anyone follow through with them after their deposition to make sure they, I don't know whereabouts, if this was a walk across the bridge situation or if it's a different part of a return situation? Your Honor, I will say that I did look for that in the record. The representations made by the government in its motion to declare the witnesses unavailable did say that, I believe it was Francisco Maldonado was deported. But I didn't, and that prior to his deportation, he was given a letter which gave him the same video deposition. Now, with respect to Hernandez Ruiz, I didn't find anything with respect to definitive when he was deported. But during the video depositions, the government, at the very end in the admonitions that were given to the witnesses, basically clarified or confirmed that in exchange for their cooperation, that the government agreed to allow them to voluntarily depart. May or may not happen. Well, I think, Your Honor, these witnesses... If they're not watched, I mean. Well, they were in a halfway house. So it's not like the government allowed the witnesses to just be free in the community. So I think you have to assume there's only an assumption that you can make here whether or not they left. Well, don't you bear the burden because you're trying to say that this was all good and fine? I think we bear the burden, Your Honor, to say that we made a legitimate, good faith and reasonable effort to find them. And that we made a good faith, reasonable effort to assure that they would be present in the event that we needed them. And in this case... It is a hard rule, but it's a constitutional imperative. And just looking at this case, the Alley v. Tirado sort of spectrum, it's an unsatisfactory rule for us to sort of pick and choose, but it is an imperative. Functionally, it's hard because we're talking about an immense volume of people. I suppose, in a sense, they're unindicted codes of conspirators. They have themselves paid the defendant to be smuggled in, and then they are here illegally. So there's a huge priority to getting them out. On the other hand, when you prosecute the person that they've paid to get smuggled, you have to get the witnesses back. So that's the obvious sort of odd circumstance. Yes, Your Honor. Here's what I heard the defendant refine his proposed rule of law to be. His, as I understood it, and I may be misstating it, he said in oral argument, the rule should be that the government's actions are only reasonable in good faith if you offer to the material witness that they can stay before they go. And what is your thought? Do you know of any court that's adopted that rule? Your Honor, I have not found anything to that effect. Okay, but there is some sense to it. Obviously, we never know when a trial will occur. It could be six months. It's taxpayer expense. We have huge numbers of people being deported. But what would be wrong with that rule? Your Honor, I think the practicality of that rule is something that it's not required under the law. There is case law which says that the fact that the government allows a witness to return to a foreign country does not preclude a finding of good faith. And so basically, the fact that they're allowed to leave the country, even under deportation, doesn't mean that the government hasn't exercised good faith. So their point is if you just stated in the record to the material witness you may stay, that would be this pre-deportation good faith gesture. That wasn't done here. I don't think there was any discussion about whether or not they were given an opportunity to stay under some type of parole. But I don't believe that is required under the law, Your Honor. I think under the law— And you're telling me that other courts have explicitly said that isn't required? Well, I believe in Toronto, it said that allowing a witness to leave the country— They may want to leave, right? Right, or deportation. It actually said the fact that a witness is deported, which means they're not voluntarily allowed to leave. The government is telling them to leave. So it's an odd seesaw. Do you see it that we have to find good faith at the front end and good faith at the back end? Or can they cross compensate? What's our rule? I think, Your Honor, it's to view everything in the context. Like in this case, for example, the reasonableness should be considered in the context— the reasonableness of what they did after the witnesses left the country should be in the context of the efforts that were, I guess, what was happening in the trial. And in this case, before the district court scheduled the first trial setting, Foster had asked for two continuances at docket calls. In both of those docket calls, the order which granted the continuances on the docket calls, the court made a note that the continuance was granted because the defendant needed additional time to prepare due to complex discovery issues and for plea negotiations. So that was the docket call on September 1. Then there was a docket call on October 7. So at least as of October 7, plea negotiations were still being considered. I guess I'm just—the volume of aliens being smuggled in is so huge, and people—the government is trying to prosecute every smuggler they can get. I would have thought there'd be a U.S. attorney manual policy exactly on this issue. You may only let the material witness go if you do these things and these things. You're not aware of any court case or any U.S. attorney manual provision that says this is what is reasonable, courts have said. No, Your Honor. In all honesty, Your Honor— So AUSAs are just sort of advising ICE agents sort of, this is enough, we'll do our best? No, I think it's going to be on a case-by-case basis about what is required. That's fine. Why is less required here? Well, less is not required here, Your Honor. It's just that what was done was reasonable. No investigator went to go verify—nobody even called Mexico to see if these were actual addresses or phone numbers or anything. Well, there is no evidence in the record that the phone numbers were not valid. As a matter of fact, if you look at the— Was someone found at those phone numbers and someone else picked up the phone and said, he's not here, you know? No, but I think you can't assume that that information that they gave under oath was invalid because under the litany of the efforts that the government made, the agent is leaving voicemails. There's nothing that says the telephone was disconnected. Why should we assume that it is valid? I mean, you know, unfortunately, under oath, people give information every single day about their whereabouts and where they're from and their address and where they can be found every single day to agents under oath, and it's false. So why do we assume that these people were telling the truth and without any kind of follow-up? And I'm not besmirching their character in any way. I'm just saying, why isn't there at least a minimal duty to verify the information through other sources? I think the reasonableness must be what is reasonable for this huge, vast population of illegal aliens who are material witnesses when they're transported. What is reasonable, you have to take into consideration the necessary efforts that it would take on the part of the government to investigate every single personal address, personal phone number, personal email. Of material witnesses in a smuggling case. Not of every single person who comes across the border, but of people who are material witnesses, co-conspirators and indicted in a smuggling case. Your Honor, in every smuggling case, there are material witnesses because the persons being smuggled are the material witnesses. So when you discuss reasonableness and whether a court would determine, and I think basically that's why there's case law that says deportation, the fact that they're deported doesn't preclude good faith. It just means that government has to make it a reasonable, good faith effort to make sure they're there. And in this case, the government's efforts began at the deposition. What other circuit is given any insight into this spectrum? What's good faith, what's not? I'm thinking that may have been the 10th circuit, Your Honor. It's probably cited in the briefs? Yes, it may be cited. And are there any helpful district courts? No, Your Honor, I did not cite any district court cases in the brief. That's fine. But in that respect, if I may have a moment. And this case is different from the Toronto case where the court said that it wasn't sufficient. In Toronto, basically, there was a long period of time, and the long period of time was five months, and they waited until a week before the trial. But in this case, it was three and a half months after the depositions, and during part of that time, plea negotiations were being conducted. So it wasn't even clear that there would have been a trial. In this case, there's admissions. The defendant actually gave confession that he had conducted it. So I think the reasonableness of the government's conduct or efforts in this case has to consider the context of that. So you think if somebody might plead, you have to do less? No, Your Honor, that's not what I'm saying at all. Well, what is the context that you're wanting us to continue? The context of what I'm saying is, Your Honor, is what is necessary and what is reasonable for the government. Now, the government did not delay unnecessarily. The moment the government received the trial setting. Prior to that time, there was never a trial setting to advise the witnesses of. So the government couldn't make arrangements for them to be here at a particular date. If the trial setting had been maybe even a year later, hypothetically, would the duty have been as soon as you know of the trial setting, or would you have had an interim duty to keep in touch, which is what that case we just talked about seems to say, that at some point, there is an interim duty to keep in touch, even if there is not a trial setting. And I think that that is clear from the Dorado case. When is that kick in? Is it six months, four months? When does that kick in, an interim duty to keep in touch? And I think that does have to depend on a case-by-case basis, Your Honor. And that's where all of the circumstances should be taken into consideration in determining what efforts the government had to make. If there had been a six-month delay here between the deposition and the trial, would you still be here arguing that it was good faith? I'm sorry? If the government had done nothing for six months? If the government had the deposition on July 22nd, and then there's a six-month delay because the trial is going to be in March or April instead of January, would you still be here arguing that it was good faith if there had been a six-month gap? Well, I think it would be more difficult, Your Honor, because under the Dorado case, there was a five-month delay. But during that five-month period, nothing was done. And I think there was even, if I'm not mistaken, I think it was Dorado where two months had lapsed after the trial setting. So depending on the circumstances of this case, this case doesn't fall under the type of circumstances. So are you right up against it? Three and a half is fine, but five months would be problematic? No, I don't think so, Your Honor. I think when you consider, and that's why I brought up the point about the context of what was happening at the time. I'm trying to figure out what context makes a longer delay appropriate. For example, Your Honor, if a defendant had given some indication that he was going to plead guilty. I thought you told me just a second ago that the fact that the person might plead is not a reason to delay contact. It's not. It's a factor, Your Honor, I think. So you do think it's a factor. The fact that the person might plead means you don't have to keep up with the witnesses. No, I think, no, if the government had sufficient information about where they could contact the witnesses in the event of a trial, I think the government is entitled to rely on that information. Can I ask two fact questions and one legal question? Fact questions. Is it indisputable that the government started to try to secure them the minute a trial was set? Uh, I believe the timeline that was given in the government's motion was that there was a docket call on November 4th, and the docket setting says that the trial was set, but the order setting the trial didn't occur until November the 7th of 2016, and then on the 8th, November 8th, is when the agent began to make calls. Okay. The next record question is, did these material witnesses have counsel? Yes, they did, Your Honor. So counsel was present when under oath they said that they would update the government with their addresses and contact information. That is correct. And in addition to that, they were, they gave their contact information to the material witnesses attorney. And then legally, legally, and don't be opportunistic here because I may be completely wrong, but even if the government hadn't taken good faith efforts, would the fact that we have a video where they were given a cross-examination opportunity and stopped 10 minutes short of the time they were allotted, could that ever make the underlying unavailability issue harmless? Is the government arguing that? I'm sorry, Your Honor. Let's say we conclude there weren't best practices. We conclude it doesn't meet good faith. Whatever rule we think we can improve on the existing spectrum. So we come to that conclusion. But nonetheless, we have the video, we have the defense cross of these witnesses, and they stopped short of the time allotted, I think. Okay. Would the underlying confrontation clause violation, a constitutional one, be harmless beyond a reasonable doubt? Well, under harm, yes, there is a harmlessness argument in terms of the confrontation clause. The fact that, and I think the harmlessness argument would be, first of all, unavailability is required. Yes. You don't get to harmlessness. Yes. You have to have both unavailability and an opportunity to cross-examine. That's what I thought. So if... So the government isn't pressing that as an argument. If we find unavailability that you didn't make a good faith effort, we would have to vacate and reverse, set up for a new trial. The government's got to find these people. No, Your Honor. I think there is a harmless argument, but the harmless argument would be that if the videotapes had not been introduced, it was harmless. It would have been harmless. Without the videotapes, the government still could have... Oh, I see. You wouldn't need them at all because... Is it just the case agent's testimony is overwhelming? Is that what you're saying? No, I'm... Yes. No, I'm saying if there was sufficient information for the government to make its case without the video depositions... Which is the case agent's testimony, right? Case agent... Plus maybe the admission of the defendant to the agency. Yeah, the defendant's admissions... There's a confession in this case? There was a confession. Of course, he refuted that confession. And I'm sorry, I'm done with time. The defendant basically redacted or refuted his confession at trial. So he backed off on that. But yes, the harmlessness would be that if the government could make its case without the cross-examination of the... I mean, the video depositions, then it would be harmless. And I did make that argument in my brief. Is there no further questions? Thank you. Thank you. We have your argument. Mr. Morales, you said time for rebuttal. Yes. With regards to what was indicated, that I said that they should be required to give them the opportunity. In Tirado, they were quoting to Elie, and they said... This is almost a direct quote, if not direct. It said, government's good faith efforts should include efforts at keeping witnesses in the United States, as this is the best way to ensure a witness will be present. And deporting a witness, you know, if you deport them, then... Good faith, even against their will? Even if, in the negotiations, court schedules a trial a year from now? I think it varies case by case. But I mean, it says they should make efforts at keeping... So it's back to that. You made the point, which intrigues me, that at least you have to offer. Right. And they talk about that. And so I'd like to say that I came up with that on my own. But that's from those two cases, from Elie and Tirado. So the other thing that I'd like to explain to you a little bit, I know you keep... I know there was a lot made out of, well, you know, there's so many cases and we can't do this. Generally, the way it works in El Paso is, you are, on these kinds of cases, you're set for a video deposition within two weeks of the day you're arrested. And what happens in the majority of those cases is they plead out. Because it's either we're going to have the video depo, or you're going to plead. If you don't plead, then, you know, the government has... You know, we may charge you with something worse than what you're... than what we'll let you plead to if you plead before the video depo. So a majority of the cases get resolved by pleas that occur prior to the video depositions. The video deposition is actually not a commonplace thing that happens where we actually go through the video deposition. So, and of course, the fact that you have a video deposition doesn't automatically mean you're going to have a trial. But that's a good indicator to the prosecution that, you know, this case may actually go to trial. This is a case where you actually have to make some efforts to try to keep this person in the country. So this is not every case. This is probably one in 20 cases, 50 cases, some very small number. You handle a lot of these? You're familiar with the system? I do, and I am. May I ask just how often do you see the government able to find someone in Mexico and bring them back? Actually, the way, and I should backtrack a little bit, the ones that I've handled in this kind of case always end up in pleas. You've never seen the government able to find someone and pull them back? Well, this is the only one that I had tried of this kind of case where we actually went through the video depositions and actually had a trial. So in the other cases, it wasn't necessary to find them because the person pled guilty. It can't be that every one of these, there have to be diplomatic channels reaching out to Mexican government to help. But I guess this virtually has never, yeah. And another point that I wanted to make, I mean, the government in their argument says, well, we should assume this and assume that. And that's one of the big problems here is the burden was on them. And if they had met their burden and done what they needed to do, we wouldn't have to be assuming and the court wouldn't have all these questions. And you need to wrap it up. That's all I have, Your Honor. Thank you. Thank you. We have your argument. This case is submitted. We note that you were court appointed and appreciate your service today. Thank you.